9609

NELSON v. ATLANTIC, GULF & PACIFIC CO.

(92 S. E. 194.)

1. PLEADING—UNCERTAINTY—COMPLAINT FOR INJURY TO SERVANT.—In an action for death of a servant on a dredgeboat, paragraphs of the complaint alleging that deceased was on the narrow ledge of the boat, running alongside of a cogwheel, taking measurements for and in the presence of his superior, and that, while so doing, the cogwheel revolved by defendant's negligence in failing to take precautions against such an occurrence, and that deceased was caught in the wheel and killed, were not uncertain, making the issue, why did the engine move and cause the cogwheel to turn around, most of the testimony having reference to such issue, so that defendant was not surprised by any indefinite allegations.

2. PLEADING—EXCEPTION—WAIVER BY FAILURE TO OBJECT TO EVIDENCE.— Where defendant, sued for death of its servant, moved to require

1—107.

plaintiff to amend for uncertainty of paragraphs of the complaint, which was denied, but there was no exception that testimony was admitted to prove a case not pleaded, the exception to the Court's action in denying the motion is academic; for, though defendant may have apprehended surprise from indefinite allegations, the trial revealed no surprise.

3. Trial—Instruction—Importance of Agreement.—After two mistrials the trial Judge was right at the very outset of his charge to stress the importance of their agreeing upon the jury, the jury not being instructed that they might surrender their opinions, but being charged that they might reason together, that one might adopt the view of another, if the view was better than his own.

4. Master and Servant—Injuries to Servant—Question for Jury—Assumption of Risk.—In an action for death of a servant, whether the servant assumed the risks ordinarily incident to the employment was not a question of fact for the jury, but it was a question of fact for the jury whether the servant was killed by one of the ordinary risks incident to the employment in which he was engaged.

5. Master and Servant—Instruction—Province of Jury—Law Question—Assumption of Risk.—In an action for death of a servant, the Court charged that, if the jury found that the servant assumed the risk ordinarily incident to the employment, then, it being an assumption of risk, he cannot recover if he was injured by one of the ordinary risks incident to the employment in which he was engaged. *Held* that, though a refined reading of the charge would sustain defendant's construction of it that it left to the jury to find whether or not the servant assumed the ordinary risks incident to his work, nevertheless a jury would hardly be misled.

6. Trial—Instruction—Charge on Facts.—In such action defendant requested the Court to charge that, when one takes employment under another, he assumes the natural and ordinary risks of the employment, including the negligence of a fellow servant selected with due care, and that, if the jury found that injury to decedent was caused through the negligence of another employee of the defendant, and that the negligent act performed by such employee was not in the performance of any duty which the master owed decedent, the performance of which the master had intrusted to the negligent employee, then the injury to decedent was due to the negligence of a fellow servant, and plaintiff could not recover. *Held,* that such request was not improper as a charge on the facts.

7. Trial—Instructions—Repetition.—Refusal of a request to charge, covered by the party's other request to charge, which the Court allowed, was not erroneous.

8. Master and Servant — Actions for Injuries — Instructions—Responsiveness to Issue.—In an action for the death of a servant, where the answer alleged, to defeat the action, not plaintiff's sole negligence, but his contributory negligence, the charge that, if the

servant was injured by the negligence of a fellow servant as the sole proximate cause, the negligence of the fellow servant being another sole proximate cause, plaintiff could not recover, and defendant's request to charge that, if the proximate cause of the injury to the servant was the servant's own negligence, concurring and combining with that of the employer, he could not hold the employer responsible, were responsive to the issue made by the pleadings.

9. Master and Servant—Injuries to Servant—Instruction.—In an action for death of a servant, where the Court instructed that defendant corporation was bound to guard its employees against negligence of coemployees by the promulgation of reasonable rules for the management of the business, and also charged the defendant's request that rules should be enacted and promulgated in complex and hazardous employments, the Court, by necessary implication, left it to the jury to find if the business was so complex as to require rules for its government.

10. Master and Servant—Safe Place to Work.—The master must provide only reasonably safe machinery and a reasonably safe place for his servant to work.

11. Master and Servant—Injuries to Servant—Accident as Proof of Negligence.—A servant's mishap in the course of his employment, as from the unexpected movement of an engine, is not by itself proof of the master's negligence.

12. Master and Servant—Assumption of Risk.—A dredging company's employee working on a dredge assumed the ordinary risks incident to the service he was called upon to perform in working with his legs between the spokes of a wheel, but the risk, if hidden underneath the deck, was not a part of the contract of service.

13. Master and Servant—Injuries to Servant—Contributory Negligence.—If a dredging company's employee was negligent, and his negligence was one of the proximate causes of his injury, he had no remedy.

14. Master and Servant—Injuries to Servant—Cause of Accident—Question for Jury.—In an action for death of a dredging company's employee, caused by having his legs caught in a cogwheel when the engine driving it unexpectedly turned over, whether the movement of the engine and also of the cogwheel was caused by a vacuum operating unevenly on the piston *held* for the jury.

15. Master and Servant—Duty of Master—Appliances.—If an engine of the type used in a dredge was liable to turn over, and the fact was known to or should have been known to the dredging company, and the particular engine in the dredge had previously turned over without steam being let on, it was the duty of the dredging company to guard against such an event.

16. Master and Servant—Injuries to Servant—Duty of Servant.—An executive officer of a dredging company, not a constructive engineer, injured by being caught in a cogwheel which moved when there

was present on the dredge two trained mechanicians, was not under
duty himself to provide the engine with a locking device and all safe
appliances for the machinery.

17. DAMAGES — INSTRUCTIONS — SUFFICIENCY—INJURIES TO SERVANTS.—In
an action for death of a servant, the Court instructed that, if the jury
found plaintiff was entitled to recover actual damages, and also puni-
tive damages, they should let their verdict speak what they meant,
whether actual or punitive, that actual damages are compensatory
damages, that punitive damages have nothing to do with compensa-
tion, being allowed by way of punishment and example, and that, if
the jury found that plaintiff was entitled to recover the former,
verdict should be, "We find for the plaintiff so many dollars, writing
it out in words, and not in figures, actual damages," and that, if they
found she was entitled also to punitive damages, they should say
"and so much, writing it out in words, and not in figures, punitive
damages," etc. *Held,* that the jury could not have misunderstood
the instructions, and the Court's refusal to instruct that plaintiff
had failed to adduce any evidence tending to prove her right to
punitive or exemplary damages, and that the jury could not allow
or consider such damages, was not calculated to influence the jury to
find the amount which they found as actual damages.

Before GARY and SEASE, JJ., Charleston, April, 1912, and
April, 1915.    Affirmed.

Action by Laura E. Nelson, as administratrix of the estate
of Philip Nelson, deceased, against the Atlantic, Gulf &
Pacific Company.    From a judgment for plaintiff, defend-
ant appeals.

Following are the fifth and sixth paragraphs of the com-
plaint, ordered reported :

"(5) That on the 12th day of November, 1911, being
Sunday, the said dredge, George W. Catt, as customary, did
not work in dredging, and while lying in Georgetown county,
State of South Carolina, the defendant, by its agent and
superintending engineer having charge of all its plants and
dredges, and being the superior officer of the said Philip
Nelson, visited the said dredge, George W. Catt, and ordered
the said Philip Nelson to assist him in his duty of obtaining
measurements of machinery of the said dredge for the

purpose of alteration, repair and reconstruction of said dredge, and while the said Philip Nelson was assisting his superior officer and agent of the defendant, under the order of such superior officer and agent of the defendant and in the presence of his said superior officer and agent of the defendant, he went below the deck of said dredge on the narrow ledge running alongside the large cogwheel operating the cutters of the said dredge, the said cogwheel not being then in motion, and while there on his knees engaged in taking the said measurements as ordered the said large cogwheel suddenly revolved and caught and crushed the left leg and right foot of the said Philip Nelson, from which said injuries the said Philip Nelson died on November 20, 1911, at Charleston, S. C.

"(6) That the said injuries and death of the said Philip Nelson were proximately caused by the carelessness, negligence, wantonness and recklessness of the said defendant in not furnishing and providing the said Philip Nelson with a safe place to work while obeying the orders of the defendant and his superior officer in using a defective, worn-out and unguarded cogwheel, in providing a dangerous place for the said Philip Nelson to work in obeying such order, in failing to make proper rules and regulations for the safety and protection of said Philip Nelson in his work in obeying such order, in knowingly failing and omitting to take proper precaution to prevent said cogwheel from revolving while the said Philip Nelson was taking the measurements of the same as ordered as aforesaid, and in failing and omitting to select and provide proper means and proper and suitable appliances for operating said machinery and cogwheel so as to prevent the said cogwheel from suddenly revolving while the said Philip Nelson was taking such measurements of said cogwheel as ordered, as aforesaid, and in otherwise knowingly failing and omitting to protect and safely care for the life and limb of the said Philip Nelson while engaged

as aforesaid in obeying the order of the said defendant company and his superior officer."

The Court's charge on the jury's duty to agree was as follows:

"Mr. Foreman and Gentlemen of the Jury: Before charging you on the law of this case, I desire to direct your attention to the fact that this is the third trial of this case, and you and I ought to end it; there have been two mistrials; it is a long case and let us, you and I, get the distinction of having ended a case of this length. I do not think it amiss to direct your attention to the fact that all litigated cases should end. The law does not expect that when you get into your jury room that all of you should be of one mind on all points in the case. The law does not expect a mistrial. The law expects you to agree. You must agree if you can do so reasonably; therefore, the law expects you to deliberate, give consideration to your fellow jurors' opinions in an honest effort to reach a conclusion of the case, give and take, so to speak; that is to say, reason together. A verdict is the combined wisdom of the 12 jurors. If it was the wisdom of one man, there would be but one of you, instead of twelve, so you are to approach the consideration of this case in a judicial frame of mind, with an honest effort to reach a verdict. You are not to shirk the responsibility of agreeing onto the shoulders of another 12 jurors; you have the responsibility of agreeing."

Defendant's seventeenth request was as follows:

"When one takes employment under another, he assumes the natural and ordinary risks of such employment, which include the negligence of a fellow servant whom the employer has selected with due care; and if the jury find from the evidence that the injury to Philip Nelson was caused through the negligence of another employee of the defendant company, and that the negligent act performed by such coemployee was not in the performance of any duty which the master owed to Philip Nelson, the performance

of which duty the master had intrusted to the negligent employee, then the injury to Philip Nelson was due to the negligence of a fellow servant, and the plaintiff cannot recover."

*Messrs. Miller, Bissell & Miller, Hagood & Rivers,* and *Nettles & Tobias,* for appellant.

*Messrs. Miller, Bissell & Miller* and *Hagood & Rivers* cite: *As to motion to require complaint made more definite and certain:* 81 S. C. 354. *Evidence that engine moved and wheel revolved, and conjecture as to cause is not sufficient to establish defendant's negligence:* 66 S. C. 256; 69 S. C. 530; 72 S. C. 402; 75 S. C. 103. *No legal evidence of negligence on part of defendant in respect to this engine:* 34 S. C. 315; 18 S. C. 262; 84 S. C. 288; 86 S. C. 131. *The circumstances did not impose on the defendant the duty of posting notice of danger:* 26 Cyc. 1157. *Contributory negligence:* 86 S. C. 69; 80 S. C. 502. *Assumption of risk:* 86 S. C. 116; 85 S. C. 370; 71 S. C. 56; 82 S. C. 548. *Compromise verdicts:* 29 A. & E. Enc. of L. 1033; 46 Mich. 623; 10 N. W. 44; 41 Am. St. Rep. 183.

*Messrs. Geo. H. Moffett* and *J. P. K. Bryan,* for respondent, submit: *Complaint was sufficiently definite:* 66 S. C. 12; 68 S. C. 201; 81 S. C. 354; 87 S. C. 254; 81 S. C. 355; 97 S. C. 46; 79 S. C. 469; 81 S. C. 355; 65 S. C. 224; 66 S. C. 17; 91 S. C. 424. *Deceased worked under superintendent:* 95 S. C. 139; 96 S. C. 153, 154. *No safe place:* 84 S. C. 392. *Recklessness:* 88 S. C. 7; 90 S. C. 308; 92 S. C. 76, 77; 102 S. C. 165; 153 U. S. 215; 214 U. S. 256. *Offer of settlement:* 89 S. C. 280, 286. *Charge on duty of jurors:* 74 S. C. 137; 68 S. C. 81. *Assumption of risk:* 98 S. C. 262. *Harmless error:* 100 S. C. 359; 102 S. C. 165, 168; 93 S. C. 45; 240 U. S. 74. *Proximate cause:* 91 S. C. 150; 93 S. C. 45; 102 S. C. 165, 168; 240 U. S. 74. *Charge on facts:* 100 S. C. 21, 22, 33, 38; 91 S. C.

104, 110, 202; 93 S. C. 376.  *Issues as to damages:* 103 S. C. 21; 96 S. C. 268, 278.  *Notice to master:* 93 S. C. 395, 397; 72 S. C. 415; 64 S. C. 215; 99 S. C. 232, 249. *Contributory negligence and assumption of risk:* 89 S. C. 389; 94 S. C. 410; 72 S. C. 348; 73 S. C. 503; 224 U. S. 581; 229 U. S. 317.  *Denial and dispute as to defect:* 232 U. S. 94, 100, 101; 72 S. C. 423.  *Issue for jury:* 95 S. C. 138; 102 S. C. 275 and 423; 235 U. S. 389; 236 U. S. 668; 99 S. C. 100; 97 S. C. 403.

February 10, 1917.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

Action in tort for the negligent and the wilful killing of Philip Nelson on a dredgeboat called the Geo. W. Catt, in Winyah Bay, on Sunday, November 12, 1911.  The cause was tried in the Charleston Common Pleas three times.  On the first and second trials the jury failed to agree.  On the third trial the jury returned a verdict for the plaintiff for $28,691.24.  The defendant has appealed from that judgment.

There are 23 exceptions, of which 6 are to an order of Judge Gary wherein he declined to grant a motion by the defendant to make the sixth paragraph of the complaint more definite and certain, and of which the other 17 exceptions are to the alleged errors of Judge Sease made in the trial of the cause.

A decision of the cause has been too long delayed, and in large measure by the bulky record.  The case contains 489 pages, nearly all of which is testimony.  The arguments add 140 other pages.

The exceptions have been argued by the appellant under three main titles: First, the refusal of Judge Gary to order amendment; second, errors in the charge of Judge Sease; and, third, the refusal of Judge Sease to grant a nonsuit. Under each of these titles there are many subdivisions, all of which we cannot hope to ramify.

Upon the first two heads we shall not write much; for in the oral argument at bar appellant's counsel said: "The main issue is: Why did the engine move? It revolved twice." And the burden of the argument and the justice and meat of the case lies, not in the law of procedure, but in the testimony of the witnesses and the rights which arise thereout.

1. Adverting to Judge Gary's order, the reporter will set out the fifth and sixth paragraphs of the complaint. They are the allegations challenged by the defendant for uncertainty. They allege, in brief, that the deceased was on the narrow ledge running alongside a cogwheel, taking measurements there for and in the presence of his superior, and that while so doing the cogwheel revolved, by the defendant's negligence in failing to take precautions against such an occurrence, and that the deceased was caught in the wheel and killed. As was stated by the appellant's counsel in his opening *(supra)*, the real issue in the case is: Why did the engine move and cause the cogwheel to turn around?

The pleading made that issue, and most of the testimony had reference to it. There was no need to set out the testimony. The rule in such a case as this is laid down in *Hughes* v. *Orangeburg Mfg. Co.,* 81 S. C. 354, 62 S. E. 404; and that case is cited by the appellant. And, however the defendant may have apprehended surprise from indefinite allegations, the trial subsequent to the motion revealed no surprise; for there is no exception that testimony was admitted to prove a case not pleaded. The exception, therefore, now turns out to be academic.

2. The charge of Judge Sease is challenged in five particulars; and these we shall consider without enumerating them. We think the Judge was right, after two mistrials, to stress the importance of an agreement on the third trial. The trial of a cause like this exacts intense strain on all hands; and a jury often needs to be

reminded, within proper limits, of course, of the duty to
agree.  In the instant case the utterance of the Court was
in the very outstart of the charge.  The jurors were not
instructed that they might surrender their opinions; they
were charged that they ought to reason together, so that
one might adopt the view of another, if that view was better
than his own.  In this respect jurors only proceed as other
bodies of men proceed; no one man in any body of men is
entitled to a precedence of opinion.  Let the reporter set
out the words of the Court.

3.  The next suggested errors in the charge have refer-
ence to the subject of assumption of risk.  Appellant con-
tends that the Court left it to the jury to find whether or not
the plaintiff did assume the ordinary risks which were inci-
dent to his work, when the Court ought to have charged the
jury that the law cast on the plaintiff the assumption of such
risks.  And the appellant further contends that the Court
refused to charge the seventeenth request, which the appel-
lant argues is a correct statement of the law on the subject
of the assumption of risk.  The particular language of the
Court which is excepted to is this:

"If you find, gentlemen, that the servant, Nelson, assumed
the risk ordinarily incident to the employment, then, it
being an assumption of risk, he cannot recover if he was
injured by one of the ordinary risks incident to the employ-
ment in which he was engaged."

The refused request simply declared that:

"When one takes employment under another, he assumes
the natural and ordinary risks of such employment, which
includes the negligence of a fellow servant when the
employer has selected with due care."

If the Court meant in the language first above quoted to
leave it to the jury to find if Nelson did assume the risks
ordinarily incident to the employment, then that is not the
law.  But if the Court meant the jury to find on a
question of fact, to wit, Were the risks "one of the
ordinary ones incident to the employment in which

he was engaged?" then that was the law.     The last 22 words of the quotation, separated from the words which went before them, are these, "he cannot recover if he was injured by one of the ordinary risks incident to the employment in which he was engaged."

A refined reading of the whole quoted matter will sustain the appellant's construction of it; but a jury, not accustomed to such critical analysis of sentences, would hardly be misled by the charge.     And that is the office of an exception.     The Court declined to charge the seventeenth request, not because it embodied an incorrect postulate, but because the Court apprehended, mistakenly, we think, that by the employment of the additional words (not quoted above) the request was inimical to the law which prohibits a charge upon the facts.     Aside from these considerations, however, the principle now contended for by the appellant was stated in the eighth and allowed request of the appellant.

4. Another exception to the charge goes to so much of it as refers to a proximate cause of the injury.     The Court charged:

"That if the servant was injured by the negligence of a fellow servant as the sole proximate cause thereof, and the negligence of the fellow servant being another sole proximate cause, then the plaintiff cannot recover."

It is true, as is suggested by the appellant, that there cannot be two sole causes of an injury; but the Court did not mean to so hold, for at another place in the charge the jury was instructed:

"That if the negligence of a fellow servant was the sole proximate cause, or one of the proximate causes, the negligence of the plaintiff being the other, then the plaintiff cannot recover."

Yet we think the Court did not hold the jury to finding that there must have been two causes at work to defeat a recovery.     Moreover, the last quoted expression is the same

postulate as was stated by the appellant in the eleventh and allowed request, to wit:

"If the proximate cause of the injury to the employee is the employee's own negligence, concurring and combining with that of the employer, * * * he cannot hold the employer responsible."

The answer alleged to defeat the action, not the sole negligence of the plaintiff, but the contributory negligence of the plaintiff; so the charge and the request to charge were responsive to the issue made by the pleading.

5. Again the charge of the Court is challenged when it instructed the jury:

"That the corporation is bound to guard its employees against the negligence of coemployees by the enactment or promulgation of reasonable rules for the management of its business."

The appellant admits that rules ought to be enacted and promulgated in those employments which are complex and hazardous. And the Court expressly charged so much in the allowance of the defendant's fifth request. The Court, therefore, by necessary implication, left it to the jury to find if the instant business was so complex as to require rules for its government. The complexity of the business was a question of fact, thrust by implication betwixt the charge and the request to charge.

The issue of wilfulness and punitive damages raised by the nineteenth exception will be presently considered.

6. The eighteenth exception was not argued; it referred to the Court's refusal to allow the eleventh to sixteenth requests, both inclusive, and the eighteenth request. The twenty-third and last exception suggests the same error which we shall immediately consider.

After so long, but none the less, a necessary cutting away of underbrush, we come now to what appellant's counsel called the "main issue;" and that is: Does the testimony

make a case against the defendant which ought to have been submitted to a jury? Some detailed and perhaps tedious account needs to be given of the circumstances of the homicide.

The dredgeboat was in shape a parallelogram, with no capacity to propel itself. Its business was to brood upon the waters, to cut up the mud underneath the water, and to suck up that mud and cast it upon shore, and thus to deepen the channel. To compass that task the dredge was provided with a cutter and a suck pipe; but this case has to do only with the former. The cutter was a sharp contrivance affixed to the outer end of a steel shaft 75 feet long, which might protrude down underneath the water. At the other end of that shaft, on the dredge, there was affixed a cogwheel at right angles to the shaft which received its cogs— the power that revolved the cutter shaft. Another cogwheel, that which did the hurt, 6 feet in diameter, stood parallel with the cutter shaft. It had spokes which reached from its center to its rim. Power was transmitted to the wheel by a system of gearing from an engine in one of the dredge's horns, called the cutter engine, a machine of prime importance in this inquiry. From the forward end of the dredge there stretched two long parallel arms, called the horns of the dredge. They might be likened to the forearms of a huge crab. Betwixt these horns the steel shaft aforesaid was laid in what is called the well; and the contrivance 12 inches wide which supports the shaft is called the ladder. On each side of the ladder was the bulkhead or wall of the dredge horns, some 16 inches from the ladder; and the ladder is parallel with the 6-foot cogwheel. At the instant of the accident now under consideration Philip Nelson and one Dietert were kneeling on the girder of the ladder facing the bulkhead some 14 inches away, and with their backs to the 6-foot cogwheel. They were measuring a bearing 16 inches below the top of the main girder. To do that their bodies leaned over towards the bulkhead, and their

feet projected backwards in an opposite direction, and towards the shaft, and through the spokes of the said second wheel. While in that position that second wheel revolved. Dietert felt its movement and jerked his legs out. Nelson's legs were caught and crushed so that he thereafter died.

The revolution of the wheel was confessedly caused by a movement of the engine. That instrumentality called the cutter engine was located to the left of a man standing on deck and facing the ladder well; it was under the deck in the hull of the left horn; it supplied the power to whirl the cuttershaft through a train of gears; it was a double simple engine with two horizontal cylinders. Betwixt this engine and the boiler was the lever house, and in the lever house there is the first valve set to let pass the steam from the boiler. The next or second valve is immediately over the cylinders of the engine. Before steam can get into the engine and move it, both these valves must be open. And there is a third valve called the exhaust valve underneath the engine which operates after the steam has passed through the cylinders in a pipe leading to the condenser. That valve, called the exhaust and sometimes the stop valve, cuts off the engine from the condenser, located some 60 feet away. If the valve over the cylinders and that underneath the engine are closed, the steam is cut off from the engine, so that it may not be moved by direct steam power.

At the incident of the accident one Joe Nelson and one Carl Lingreen, the former an oiler and the latter a machinist, were in the engine room at the cutter engine, and Peter Axe was in the lever house attentive to what was going on. Some few minutes before the accident Lingreen and Joe Nelson had been running that engine to test it. It ran perhaps ten minutes and then was stopped. In perhaps five minutes more the engine started again, and it was that movement which revolved the 6-foot cogwheel that caught Phil Nelson's legs. What instrumentality caused the engine to move this second time is the chief issue of fact in the cause.

The plaintiff's counsel and witnesses say the cause was the engine "turning over" from the operation of vacuum. The defendant's witnesses and counsel say the steam valve was opened a second time by Lingreen and Joe Nelson and steam put the engine in active motion. The sharp contest on that issue arises out of the suggestion by way of defense that, if the steam was turned on by Joe Nelson or by Lingreen or by Axe, then that was the act of a fellow servant of Philip Nelson, for which act the defendant is not liable to the plaintiff. To this issue we shall revert again, after the disposition of those circumstances which lie ahead of it.

7. The defendant has elaborated nine reasons why the nonsuit ought to have been granted. The argument is on the testimony, and not on the law. The nine grounds will not be considered in their order of argument; and some of them are so closely connected that such ones will be considered together.

The setting of the accident was this: As before stated, the time of it was on a Sunday afternoon. That day was set aside for repairs to the dredge and machinery. The dredge was not operated to cut and suck on that day. And on the instant day one Dietert, a mechanical engineer from New York city, in the defendant's service, had been summoned by Mr. Gaylord, the division superintendent, to meet him at Georgetown and to inspect the machinery of the dredge. These two men were on the dredge that day, and Nelson met his death while he and Dietert were making the inspection.

8. It is true that the master must provide only reasonably safe machinery and a reasonably safe place for the servant to work; and it is also true that the mishap by itself is not proof of negligence. In the very nature of the case 10, 11 the working place of the servant is often perilous and cannot be otherwise. And we agree with the appellant that the issue here is not so much whether the immediate place of the accident was reasonably safe as was

there negligence in respect to the movement of the engine at another place. The work Nelson was doing at the instant was not in itself perilous; the danger came from another place, from the cutter engine room.

It is also true that Nelson assumed the ordinary risks incident to the delicate service he was called upon to perform. Men of his class constantly subject themselves to perilous situations; there is no other way to accomplish effective service. Workmen must often stand in the way to accomplish effective service. Workmen must often stand in the very jaws of death to render genuine service to the master and to the public; and that fact upon occasion exalts the service to heroic heights. But the risk the workman agrees to assume must be manifest to him. If it be hidden underneath the deck of the horn of a dredge, as the evidence tends to prove, then it was not a part of the contract of service.

Akin to the assumption of risk is the contributing causal negligence of the servant. And it is true that, if Nelson was negligent, and that was one of the proximate causes of his hurt, then he has no remedy. But the testimony tends to show Nelson was where he ought to have been, there was no open danger, he was directed to go there by Dietert, and Dietert was there with him at the instant of the accident. It will not do to say, as the appellant has argued, that Dietert had no authority over Nelson. Dietert was the trained man, sent hither by Gaylord to inspect machinery in the charge of Nelson. If Nelson could balk the inspection, then Dietert's mission would be an idle one. Nelson made the measurements and reported them, and Dietert set down the reported facts, and passed judgment upon them in the presence of Nelson. Dietert was the directing mind that day, and it was Nelson's business to do the thing in Dietert's way. There might have been two ways open to Nelson to do the work had he been following his own head; but when his superior directed one way not

manifestly dangerous, any other way was closed to Nelson. And the fact that Dietert occupied the same physical attitude that Nelson did, and barely escaped the fate which befell Nelson, and had the same sources of information that Nelson had, is evidence that neither party had any reason to anticipate the event which did happen.

9. We come now to consider the issue hereinbefore adverted to, and that is: Why did the engine move? It did move. Nevertheless there would be no warrant in law to conclude that from the isolated movement of the engine the master was negligent; there must be other testimony to prove a lack of care.

The appellant contends that the plaintiff has framed a mere theory unsupported by testimony, that the movement of the engine was caused, not by steam turned in from the boiler through the valves, but from vacuum which operated unevenly on the piston, and which caused the engine to do what the witnesses called "turn over;" that is, caused the piston to move, and thus to start the six-foot cogwheel. There was abundant testimony by three expert witnesses that vacuum commonly caused an engine to turn over. It is true that was denied by the defendant's witnesses; but the testimony made the issue one for the jury. Leaving theory and the testimony of experts, the jury had the testimony of Lingreen and Joe Nelson, who stood by the engine at the instant of its movement, and of Axe, the leverman, who stood in the lever house above deck. The witness, Lingreen, for the defendant, testified: "I just cracked (the valve) a quarter of a turn." The witness, Joe Nelson, testified no steam was let on, and yet the engine "turned over." The witness, Axe, testified the engine did not run, and yet the same "turned over." The witness, Beuttenmuller, a civil engineer on the dredge, testified that shortly after the accident Lingreen declared that he had not turned on the steam. Peter Axe, the leverman on the dredge, testified to the same thing. Of course, Lingreen

denied any such declaration; but this testimony, and that of Joe Nelson, and that of the experts made a sharp question for the jury. And there was testimony that this same cutter engine had aforetime turned over at Savannah; but that was denied.

10. The testimony was not nearly so strong or so conclusive which went to prove that a turning over of the engine by the force of vacuum was of sufficient force to turn the six-foot cogwheel far enough around to cause the injury in the instant case. Yet there was testimony which went to that extent; and the Court would not have been warranted to direct the jury to the contrary, or to say that there was no testimony sufficient to sustain a reasonable conclusion that the cogwheel was moved to do its work by the sole agency of force of vacuum operating on the engine. The expert testimony of the defendant strongly negatived such a conclusion, and it may well be doubted; but if the fact be concluded that the engine did turn over without the cracking of the steam valve, and the testimony tends to that conclusion, and if the fact be that the cogwheel did hard thereupon crush the leg of Nelson, and the testimony tends to that conclusion, then the physical fact rebuts the theory of the defendant's witnesses. Axe testified the big cogwheel moved two feet around. Others testified it moved a foot and a half. Lingreen testified that he had barely cracked the valve so that only a small pressure of steam could go in, and yet that small amount of steam moved the machinery, if Lingreen is to be believed.

11. Concluding then that there was testimony tending to prove that engine did turn over by the force of vacuum, and that such turning forced the cogwheel to revolve, the testimony must go one step further, and tend to show that such turning over was the result of the defendant's lack of care to prevent it.

If it be true, and there was full testimony to that conclusion, that an engine of the character of this one was

liable to turn over, and that was known to, or ought to have been known to, the defendant, and that this special engine had aforetime turned over, then it was the duty of the owners to guard against such an event. The device relied upon by the appellant to accomplish this end was the use of three valves, the closing of any one of which would effect the same end as a lock on the engine; that is to say, to prevent the steam from operating. But that device was of so doubtful a character and by its nature of so uncertain operation that the jury may have concluded the three valves were constructed with no such end in view. It may be that it was not practicable to put on the cutter engine a device to lock it like that on the larger engine.

12. Now the appellant suggests if a locking device was needed it was the duty of Philip Nelson to provide it and all safe appliances for the machinery. But plainly that is not so. Nelson was an executive officer, and not a constructive engineer. On the day of the accident there were present on the dredge two trained mechanicians. No matter what office they held or what office Nelson held they were the masters that day and always. Nelson was untrained in the books, a plain working man, of character and some skill, it is true, but not a mechanical engineer. Gaylord and Dietert were present to inspect and to repair defects in machinery; the whole plan of the dredge was theirs. The cutter engine even was not subject to Nelson's direction; for it is in evidence that when Nelson, on the very morning of the accident, asked Lingreen, the first assistant engineer, to look the cutter engine over, Lingreen told him he (Nelson) had to see the chief engineer (Henderson) first about it, and Nelson came back and told Lingreen it was all right to do what was necessary to the cutter engine.

13. We now come to the contention of the defendant that any negligence which led to the event lay at the door of Lingreen, Joe Nelson, or Axe, all fellow servants with

Philip Nelson. The testimony does not certainly fix on Axe any failure to perform his duty at that instant. It is true he was in the lever house at the instant of the accident, and it is true the valve there was open, but it does not appear he then had knowledge of the plight of the two valves in the cutter engine room. Touching the negligence of Lingreen and Joe Nelson, the defendant might well say that, if they started the cutter engine the second time, against such an act, if negligent, the intestate had contracted. But the plaintiff's whole case is against a movement of the cutter engine by steam, and makes for a movement of it by vacuum; and that theory excludes the intervention of human agency. In a nutshell, the plaintiff's whole contention is that the cutter engine started from the .operation of mechanical causes which ought to have been foreseen and guarded against.

14. The final issue rests upon the refusal of the Court to charge the defendant's nineteenth request. The postulate of that request is:

"The plaintiff has failed to adduce any evidence tending to prove her right to punitive or exemplary damages, and the jury cannot allow or consider such damages."

The appellant's counsel argued:

"That, although the jury found for the plaintiff no punitive damages as such, the refusal of the Court to instruct them as requested was calculated to influence the jury to find the amount which they found as actual damages."

We think the jury could not have misunderstood the Court's instructions; and in view of the instructions presently to be set out we think the jury meant to say that the sum found represented the value of the life of Philip Nelson, and did not express any punishment to be inflicted on the defendant. This view is strengthened by the defendant's praiseworthy testimony to the high character and useful life of the deceased. The Court instructed the jury:

"Now, gentlemen, if you find the plaintiff is entitled to recover actual damages, and also punitive damages, you will let your verdict speak what you mean, what kind of damages you mean that she is entitled to recover, whether actual damages or punitive damages. Actual damages are compensatory damages; punitive damages have nothing to do with compensation; punitive damages are allowed by way of punishment to the wrongdoer, and also as an example to others. So if you find that the plaintiff is entitled to recover the form of your verdict will be, We find for the plaintiff so many dollars, writing it out in words, and not in figures, actual damages, and if you find that she is entitled also to punitive damages, you will say, and so much, writing it out in words, and not in figures, punitive damages; that is to say, if you find for the plaintiff, let your verdict speak what kind of damages you mean to find, and if you find both kinds of damages, you will name the amount of each."

Our conclusion is there was no harmful error made by the trial Court, and the judgment of that Court is affirmed.